IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

SHARON BALTZ                                                                                    PLAINTIFF

V.                                    CASE NO. 5:19-CV-5193

LIDESTRI FOODS, INC.                                                                       DEFENDANT

## MEMORANDUM OPINION AND ORDER

Currently before the Court are a Motion for Partial Summary Judgment (Doc. 35), Brief in Support (Doc. 37), and Statement of Facts (Doc. 36) filed by Defendant LiDestri Foods, Inc. ("LiDestri"). Plaintiff Sharon Baltz submitted a Response in Opposition (Doc. 41) and Response to Statement of Facts (Doc. 40), and LiDestri filed a Reply (Doc. 45). The Motion is now ripe for decision and, for the reasons stated herein, is **GRANTED IN PART AND DENIED IN PART**.

### I.   BACKGROUND

The following facts are undisputed. Ms. Baltz started working for LiDestri, a food, beverage, and spirits company based in New York, as a National Account Sales Manager on June 6, 2016. The job description for Ms. Baltz's position generally required her to have the "[a]bility to travel 60%–70% of the time" for work and specifically travel "more than 50% [of the time] based on customer needs and peak demands." (Doc. 37-1, p. 68). When Ms. Baltz began her career at LiDestri, she was only responsible for sales to Walmart and Sam's Club, which are companies headquartered in Benton County, Arkansas, where Ms. Baltz resides. Ms. Baltz was LiDestri's only employee working in Arkansas.

1

In 2017, Ms. Baltz's duties expanded to include two new accounts, HEB and Amazon, and in 2018, her customer list grew to include several Texas accounts and one account headquartered in Kansas City. Sometime in 2018, her job title changed to Director of Sales, Mid-South Region, but her day-to-day duties and job description remained the same.

Though Ms. Baltz expanded her customer base and territory during her tenure at LiDestri, she only made a total of 21 work-related trips outside of Benton County, Arkansas. (Doc. 37-3, p. 4).[1] These long-distance business trips accounted for a total of 71 days—or just over 10 weeks—of travel spread over 124 weeks of working at LiDestri This long-distance travel included all of Ms. Baltz's visits to her out-of-state clients, her attendance at national sales meetings, and her trips to LiDestri's home office in New York. Based on the travel data provided to the Court, her out-of-state travel amounted to about 8% of her total time working for LiDestri.

Ms. Baltz's first performance review for LiDestri was completed on September 9, 2017, after she had worked for the company for a little more than a year. She scored a 4.1 out of 5 and was rated "Frequently Exceeds Expectations." (Doc. 39-7, p. 12). On her second performance review dated September 2, 2018, she scored lower than she

---

[1] This data comes from an exhibit to LiDestri's Motion for Partial Summary Judgment. (Doc. 37-3). It is a spreadsheet showing Ms. Baltz's work-related and personal travel (outside Northwest Arkansas) from the time just before she was hired by LiDestri to the time just after she was fired. Though LiDestri complains that "this information was not based on LiDestri records, but on what Baltz compiled on her own in discovery," (Doc. 45, p. 4 n.4), LiDestri has failed to present any contrary proof concerning the frequency of Ms. Baltz's long-distance business travel. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . (2) consider the fact undisputed for purposes of the motion.").

had the previous year—3.3 out of 5—but she was rated "Fully Achieves Expectations." (Doc. 39-9, pp. 15–16).  The 2018 review contained certain criticisms of her performance and suggestions for improvement, but none of those criticisms concerned how Ms. Baltz interacted with her customers.  On the contrary, her supervisor, Judy Gosz, described her as "customer focused [and] consistently meeting or surpassing their expectations."  *Id.* at p. 9.  Ms. Gosz also noted that she was "poised for success against [LiDestri's] largest customers, current and new," and "exercise[d] sound judgment within her current position."  *Id.*  Two days after Ms. Baltz received this performance review, she was awarded a performance bonus. (Doc. 39-13).

Throughout her employment with LiDestri, Ms. Baltz suffered from Irritable Bowel Syndrome ("IBS"), which was effectively managed with medication until late summer of 2018.  On August 28, 2018, she began experiencing sharp abdominal pain and sought medical attention.  On September 5, 2018—the day after she received notice of her performance bonus—Ms. Baltz was admitted to the emergency room and the following day underwent gallbladder and small intestine surgery.  Also on September 5, Ms. Gosz, sent an email to company co-president John LiDestri, informing him that Ms. Baltz "ha[d] been in and out of emergency rooms" and had finally been admitted for surgery.  (Doc. 39-10, p. 2).  Ms. Gosz described Ms. Baltz as having been "out of pocket, on and off" for "almost a week" due to her medical issues.  *Id.*  In response, Mr. LiDestri thanked Ms. Gosz for the "heads up," and Ms. Gosz replied, "It seems if it's not one thing, it's another! She pushes me to my limits.  It seems she has a pattern of the 'victim.'"  *Id.* at p. 1.

On September 6, the day of the surgery, Mr. LiDestri emailed Ms. Gosz to say, "I think we both realize that [Ms. Baltz] is not the long-term solution for Walmart due [to]

3

how unreliable she is." *Id.* That same day, the LiDestris exchanged emails about their efforts to secure a replacement for Ms. Baltz. Ms. LiDestri noted the importance of "getting our feelers out for a rep to oversee Walmart," which was Ms. Baltz's customer. (Doc. 39-14, p. 2). Ms. LiDestri also opined that Ms. Baltz's "performance and fit to culture has been underwhelming" and that "she does not appear to be a long-term employee." *Id.* She noted that she "[got] the vibe from [Ms. Baltz] that she doesn't really want to work . . . ." *Id.* The company's human resources director, Sarah Miller, was also copied on this email string between the LiDestris. Ms. Miller expressed "concern[] about 'setting the table' for a performance related term[ination]" since Ms. Baltz had recently received a positive performance rating. *Id.* at p. 1. Ms. Miller cautioned, "[I]f [Ms. Baltz] is doing a half assed job I am not confident we have any documentation that supports that[,] which puts us in a precarious legal position if we find the perfect candidate and want to do something different with [Ms. Baltz]." *Id.* Ms. Miller then stated that she "would love to have a conversation with [Ms. Gosz]" to set up some "performance documentation relative to [Ms. Baltz] to get us better prepared." *Id.* at p. 2.

Ms. Baltz remained hospitalized from September 5 until September 8, 2018. While hospitalized, she scheduled an appointment to see Dr. Terryl Ortego, a gastroenterologist. Ms. Baltz maintains that her IBS symptoms intensified and became uncontrolled after her surgery, and she could no longer eat certain foods without suffering pain, nausea, and frequent diarrhea. On September 17, about a week after she was discharged from the hospital, she received a memorandum from the LiDestris thanking her for her "dedication and contribution to LiDestri during fiscal year 2018" and awarding her a base salary increase. (Doc. 39-15). However, on September 25, about two weeks

4

after her hospital discharge, Ms. Baltz was invited to dinner with Ms. Gosz, who presented her with a Performance Development Plan ("PDP").  (Doc. 39-11).

LiDestri uses PDPs to "correct performance problems" in employees.  *Id.* at p. 1.  PDPs include "timelines for improved performance of each expectation" and "consequences for failure to meet and sustain improved performance," including "the Company's right to terminate."  *Id.*  Ms. Baltz's PDP indicated several areas for improvement that had also been noted on her recent performance evaluation.  *Compare* Doc. 39-9 *with* Doc. 39-11.  However, there were some new expectations, including that she would be obligated to complete an "[i]n market visit with every broker partner every 6 weeks" which "must include overnight travel (unless Bentonville)." *Id.* at p. 3.

Ms. Baltz refused to sign the PDP until it accounted for certain accommodations she claimed she needed following her surgery.  On October 4, 2018, Ms. Baltz sent a letter to Ms. Gosz and Ms. Miller that stated:  "If you want me to continue working for the company, fine. We need to discuss some reasonable accommodations, however. Because my condition greatly limits what I can eat, I cannot travel as extensively as you want me to travel."  (Doc. 39-16, p. 1).  This was the first time Ms. Baltz requested an accommodation in writing.  Ms. Miller and Ms. Baltz exchanged more letters on October 9, 10, and 12.  (Docs. 39-17 & 39-18).  Ms. Baltz made it clear in those letters that she was not going to sign the PDP unless it referenced her need for long-distance travel accommodations.  Ms. Miller, on the other hand, indicated that the conversation regarding accommodations would happen only *after* Ms. Baltz signed the PDP.  *See* Doc. 39-18.

On October 15, 2018, Ms. Baltz attended an appointment with her gastroenterologist, Dr. Ortego, which she had scheduled the previous month.  On October

5

16, she emailed Ms. Miller a document she received from Dr. Ortego that generally described the nature of her disability. (Doc. 39-19). Ms. Miller responded later that day that Ms. Baltz would need to "specify restrictions or specific accommodations" for her disability, and to provide more "medical documentation that supports your accommodation request." *Id.* at p. 1. On October 18, Ms. Baltz replied to Ms. Miller with suggestions for possible accommodations, including job restructuring, elimination of non-essential tasks, a modified work schedule, and/or a more flexible leave policy. (Doc. 39-20, p. 2). Ms. Miller wrote back, "[I]t is incumbent upon you to identify each and every accommodation requested, specifically, and provide us with documentation from your provider supporting each request." (Doc. 39-21, p. 3). In the same email, Ms. Miller rejected some specific examples of accommodations suggested by Ms. Baltz and briefly referenced possible alternatives. *Id.* at p. 2. Ms. Miller attached to her email a form that she said must be completed by Ms. Baltz's health care provider before accommodations would be considered. (Doc. 39-21, pp. 4–5). Ms. Miller gave Ms. Baltz ten days, or until November 1, to complete and return this form. On October 23, 2018, Ms. Baltz sent the form to Dr. Ortego and requested that he complete and return it by the November 1 deadline. LiDestri fired Ms. Baltz on October 26—six days before the form was due.

After she was terminated, Ms. Baltz filed a complaint with the Equal Employment Opportunity Commission ("EEOC") and received a right-to-sue letter on July 18, 2019. She then timely filed suit on October 15, 2019. Her Complaint alleges that LiDestri discriminated against her for her disability and failed to accommodate her in violation of the Americans with Disabilities Act ("ADA"), discriminated against her in violation of the Arkansas Civil Rights Act (the "ACRA"), and failed to reimburse her for expenses she

6

incurred on its behalf. LiDestri filed a Counterclaim for breach of contract, conversion, and breach of the duty of loyalty. (Doc. 24). On December 20, 2020, LiDestri filed a Motion for Partial Summary Judgment asking that Ms. Baltz's ADA and ACRA claims be dismissed.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.,* 135 F.3d 1211, 1212–13 (8th Cir. 1997). The moving party bears the burden of proving the absence of a genuine dispute of material fact and that it is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87 (1986).

## III. DISCUSSION

LiDestri's Motion for Partial Summary Judgment focuses only on the ADA and ACRA claims and does not mention Ms. Baltz's claim for reimbursement. As such, the Court will address the ADA claim first, followed by the ACRA claim.

### a. ADA Claim

Absent direct evidence of employment discrimination, a court must analyze a plaintiff's ADA claim under the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See King v. United States*, 553 F.3d 1156, 1160 (8th Cir. 2009). However, a plaintiff alleging a failure-to-accommodate violation of the

7

ADA need not engage with the traditional *McDonnell Douglas* framework. In such cases, the Eighth Circuit has applied "a modified burden-shifting analysis," *Fenney v. Dakota, Minn. & E. R.R. Co.,* 327 F.3d 707, 712 (8th Cir. 2003), in which the plaintiff "must establish both a prima facie case of discrimination based on disability and a failure to accommodate it." *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 905 (8th Cir. 2015).

A "prima facie case of discrimination" requires the plaintiff to show she is a qualified individual with a disability within the meaning of the ADA who has suffered an adverse employment action. *Fenney,* 327 F.3d at 712. A "qualified individual" is an "individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Fenney,* 327 F.3d at 712. "[I]f the employee cannot perform the essential functions of the job *without* an accommodation, he must only make a 'facial showing that a reasonable accommodation is *possible*.'" *Fenney*, 327 F.3d at 712 (emphasis in original) (quoting *Benson v. Nw. Airlines, Inc.*, 62 F.3d 1108, 1112 (8th Cir. 1995)). "The burden of production then shifts to the employer to show that it is unable to accommodate the employee." *Id.* (quotation marks and citation omitted).

When determining whether an employee is a "qualified individual," the factfinder may consider: "(1) the employer's judgment as to which functions are essential; (2) written job descriptions prepared before advertising or interviewing applicants for the job; (3) the amount of time spent on the job performing the function; (4) the consequences of not requiring the incumbent to perform the function; and (5) the current work experience of incumbents in similar jobs." *Knutson v. Schwan's Home Serv., Inc.,* 711 F.3d 911, 914

8

(8th Cir. 2013) (citation and internal quotation marks omitted). "The employer's judgment about an essential job function is considered highly probative." *Id.* (citation and internal quotation marks omitted).

The ADA creates a "shared responsibility between employers and employees to resolve accommodation requests." *E.E.O.C. v. Convergys Customer Mgmt. Grp., Inc.,* 491 F.3d 790, 795 (8th Cir. 2007). This is also known as the "interactive process." It is initiated by the employee, who must make her employer aware of her need for an accommodation. *Cannice v. Norwest Bank Iowa, N.A.,* 189 F.3d 723, 727 (8th Cir. 1999). The employee must also provide relevant details about her disability and, if not obvious, the reason why the disability requires an accommodation. *Convergys,* 491 F.3d at 795; *Miller v. Nat'l Cas. Co.,* 61 F.3d 627, 630 (8th Cir. 1995). With that said, however, the burden is not on the employee to identify a specific, reasonable accommodation. *Convergys,* 491 F.3d at 796 (holding plaintiff satisfied his burden by providing information relevant to his disability and the disability's effect on his job performance). Instead, the employer must at least meet the employee halfway and "make a reasonable effort to determine the appropriate accommodation." *Cannice*, 189 F.3d at 727; *see also Fjellestad v. Pizza Hut of Am., Inc.,* 188 F.3d 944, 951 (8th Cir. 1999) (emphasis in original) (quoting 29 C.F.R. § 1630, App. § 1630.9) ("Once a qualified individual with a disability has requested provision of a reasonable accommodation, the employer *must* make a reasonable effort to determine the appropriate accommodation."). "[T]he employer should first analyze the relevant job and the specific limitations imposed by the disability and then, in consultation with the individual, identify potential effective

9

accommodations." *Cannice*, 189 F.3d at 727; *see also Fjellestad,* 188 F.3d at 954 (stating that employers are required to "make a good faith effort to seek accommodations").

Here, LiDestri does not contest that Ms. Baltz was disabled within the meaning of the ADA at the time she was fired and that she suffered an adverse employment action. LiDestri's argument is that Ms. Baltz cannot establish that she was a "qualified individual," since extensive travel was an essential function of her job and no reasonable accommodation existed that would have enabled her to perform the amount of travel that was necessary. The Court, however, finds that when the evidence in the case is viewed in the light most favorable to Ms. Baltz, a reasonable factfinder could determine that she was qualified to perform the essential functions of her job, including travel, with a reasonable accommodation. Further, it appears that such an accommodation was at least possible, but LiDestri refused to engage in the interactive process in good faith.

Though LiDestri insists that Ms. Baltz could not perform the amount of travel necessary for the job, even with an accommodation, there are certain facts in the record that indicate otherwise. Over the two years Ms. Baltz was employed at LiDestri, her long-distance travel encompassed a small percentage of her total travel for work, and Ms. Baltz never indicated to her employer that she could not perform her local travel obligations. Ms. Baltz's most significant clients, Walmart and Sam's Club, are headquartered a short car ride from her home. The evidence viewed in a light favorable to Ms. Baltz shows that it was non-local, long-distance travel that she was concerned about following her emergency surgery and for which she sought an accommodation. The evidence also shows that she attempted to engage her employer in a discussion about possible

10

accommodations with regard to long-distance travel, but her employer refused to do so in good faith before firing her.

Ms. Baltz made only two long-distance work-related trips in 2016 after she was hired in early June of that same year. These two business trips amounted to nine days of long-distance travel over the course of six months working for LiDestri. (Doc. 37-3, p. 4). In 2017, she made only seven long-distance work-related trips, and those trips amounted to only twenty-two days of travel for the entire calendar year. *Id.* In 2018, she made twelve long-distance business trips, amounting to forty days of travel the entire calendar year. *Id.* These facts must be squared with the parties' agreement that the job required Ms. Baltz to be able to travel 60–70% of the time and to actually travel more than 50% of the time if customer needs demanded it. The only way these travel demands align with the reality of Ms. Baltz's travel schedule is if her travel expectations included all of her local travel to Walmart and Sam's Club.

According to the timeline of events in this case, Ms. Baltz was presented with a PDP that signaled her job was in jeopardy following a positive performance review. The PDP was presented immediately after she was hospitalized and after she disclosed her illness to her supervisor. Further, a factfinder could conclude that the PDP augmented Ms. Baltz's long-distance travel obligations—at least as compared to her record of travel over the previous two years—by expecting her to make an "[i]n market visit with every broker partner every 6 weeks," with all such visits to "include overnight travel (unless Bentonville)." (Doc. 39-11, p. 3).

In view of the above facts, the Court first concludes that LiDestri did not engage in good faith in the interactive process, despite its awareness that Ms. Baltz had a medical

condition and had requested an accommodation. It was not Ms. Baltz's responsibility to identify a specific, reasonable accommodation for LiDestri; instead, it was incumbent on LiDestri to discuss possible accommodations with Ms. Baltz in good faith. *See Convergys,* 491 F.3d at 796. Here, the facts indicate that LiDestri instructed Ms. Baltz to fill out the company's "standard form" for requesting an accommodation but provided that form to her two weeks after she disclosed her illness in writing and began the interactive process. LiDestri also gave Ms. Baltz a deadline to return the accommodation form but fired her before the deadline. Summary judgment is not appropriate in view of the above facts. *See Fjellestad v. Pizza Hut of Am., Inc.*, 188 F.3d 944, 953 (8th Cir. 1999) (rejecting summary judgment when the evidence showed that the employer failed to participate in the interactive process).

In addition, summary judgment must be denied because there remain genuine, material disputes of fact regarding whether Ms. Baltz's job required "extensive travel"—however that term is defined—and whether any reasonable accommodation was available to allow her to meet the travel demands required for her job. Ms. Miller from LiDestri conceded in early discussions with Ms. Baltz that some sort of accommodation for her disability was possible. *See* Doc. 39-21, p. 2 (email from Ms. Miller to Ms. Baltz stating: "[I]f you need additional lead time to travel so that you can parce [sic] out the trip with shorter flights or time on the road, we can discuss that . . . . We can also discuss the possibility of limited Skype sessions for shorter and less critical meetings, at least for the time being."). For all these reasons, the ADA claim will be preserved for trial.

### b. ACRA Claim

Ms. Baltz failed to address the ACRA claim in her response to LiDestri's request for summary judgment. The Court construes her silence as a lack of opposition to summary judgment. *See Satcher v. U. Ark. Pine Bluff Bd. of Trs.*, 558 F.3d 731, 735 (8th Cir. 2009) ("Failure to oppose a basis for summary judgment constitutes waiver of that argument."). Furthermore, the Court is well persuaded that this claim was subject to dismissal on the merits. LiDestri does not appear to qualify as an "employer" under the ACRA. *See* Ark. Code Ann. § 16-123-102(5) (defining an "employer" as "a person who employs nine (9) or more employees in the State of Arkansas in each of twenty (20) or more calendar weeks in the current or preceding calendar year"). Ms. Baltz was LiDestri's only employee in Arkansas.

### IV. CONCLUSION

For the foregoing reasons, **IT IS ORDERED** that Defendant LiDestri Foods, Inc.'s Motion for Partial Summary Judgment (Doc. 35) is **GRANTED IN PART AND DENIED IN PART**. The Motion is **GRANTED** as to the ACRA claim, which is **DISMISSED WITH PREJUDICE**, and **DENIED** as to the ADA claim, which is preserved for trial.

**IT IS SO ORDERED** on this 23rd day of February, 2021.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE